UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


JOHNNY JONES                                    CIVIL ACTION

VERSUS                                          NUMBER: 09-4481

BURL CAIN, WARDEN                               SECTION: "A"(5)


**REPORT AND RECOMMENDATION**


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(A),
presently before the Court is the 28 U.S.C. §2254 application for
federal habeas corpus relief of petitioner, Johnny Jones, and the
State's response thereto. (Rec. doc. 1, 12). Having determined
that an evidentiary hearing is not necessary, it is recommended,
for the reasons that follow, that petitioner's application be
dismissed with prejudice.

I.   PROCEDURAL BACKGROUND[1]

Petitioner Jones is a state prisoner who is presently
incarcerated at the Louisiana State Penitentiary, Angola,

---

[1]A portion of the procedural history was taken from the
Louisiana Fourth Circuit Court of Appeal's opinion, State v.
Jones, 891 So.2d 760 (La. App. 4 Cir. ,2004).

Louisiana. On September 3, 1998, petitioner was charged by grand jury indictment with first degree murder in violation of La. R.S. 14:30. Petitioner pleaded not guilty at his September 9, 1998 arraignment. On September 26, 2001, a twelve-person jury, following a three-day trial in Orleans Parish Criminal District Court, found petitioner guilty as charged. At the sentencing hearing held on September 27, 2001, the jury was unable to reach a decision on whether to sentence petitioner to death. On April 3, 2002, the trial court sentenced petitioner to life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence.

On appeal, the Louisiana Fourth Circuit Court of Appeal reversed petitioner's conviction and sentence and remanded the matter to the trial court, finding that petitioner was effectively denied his constitutional right to peremptorily challenge jurors. State v. Jones, 862 So.2d 266 (La. App. 4 Cir., 2003). The Louisiana Supreme Court, however, granted the State's writ application, finding that the state appellate court erred in determining that petitioner's constitutional rights had been violated and remanded the matter to the state appellate court. State v. Jones, 884 So.2d 582 (La. 2004). On remand, the Louisiana Fourth Circuit affirmed petitioner's conviction and sentence. State v. Jones, 891 So.2d 760 (La. App. 4 Cir., 2004). Writs were

subsequently denied by the Louisiana Supreme Court. State v. Jones, 916 So.2d 140 (La. 2005).

Following the conclusion of his direct appeal proceedings, petitioner sought post-conviction relief. On September 7, 2007, the trial court held a post-conviction evidentiary hearing.[2] On November 9, 2007, the trial court granted petitioner relief and ordered a new trial.[3] The Louisiana Fourth Circuit Court of Appeal, however, granted the State's writ application and reversed "the judgment of the trial court granting the defendant a new trial post conviction". State v. Jones, No. 2008-K-0011 (La. App. 4 Cir. Apr. 21, 2008) (unpublished opinion).[4] On April 3, 2009, the Louisiana Supreme Court denied petitioner's writ application seeking relief in connection with the state appellate court's adverse decision. State v. Jones, 6 So.3d 760 (La. 2009).

Petitioner is now before the Court seeking federal habeas corpus relief under §2254. In his memorandum, petitioner sets forth the following claims: 1) the trial court violated his Sixth

---

[2]A copy of the transcript from the September 7, 2007 evidentiary hearing is contained in the State rec., vol. 7 of 7.

[3]A copy of the transcript reflecting the trial court's November 9, 2007 ruling is contained in the State rec., vol. 7 of 7.

[4]A copy of the Louisiana Fourth Circuit's unpublished opinion is contained in the State rec., vol. 7 of 7.

Amendment right of confrontation by allowing the jury to hear the 911 tapes because they were inadmissible under the dictates of Crawford v. Washington, 541 U.S. 36 (2004); and, 2) trial counsel was ineffective in failing to successfully negotiate a plea agreement, in being unprepared to try petitioner's case, and in failing, during voir dire, to have a venire member excused for cause and properly account for the number of peremptory challenges utilized by the defense. In its response (rec. doc. 12), the State does not contest the timeliness of the instant petition. The State, however, with respect to petitioner's first claim, argues that he has failed to exhaust his state court remedies and, as his time for doing so has expired under LSA-C.Cr.P. Art. 930.8[5] , said claim is procedurally barred. The court shall address the issue of whether petitioner's first claim is procedurally barred, along with the merits of petitioner's second claim, following its review of the pertinent facts and applicable standard of review.

II. FACTS

Elizabeth McPherson, mother of victim Courtney Russ Jones, testified that the victim had been living at 3420 Havana Street for approximately two weeks at the time of her death. Before then, she had been living with defendant, her husband, in the Chenault Creek

_____

[5] LSA-C.Cr.P. Art. 930.8 establishes a two-year prescriptive period for state prisoners to seek post-conviction relief.

4

Apartments. The victim and defendant had been together for approximately four years.

New Orleans Police Officer Chris Landry testified that, at approximately 1:25 a.m. on July 29, 1998, he and his partner Officer Michael Richter were dispatched to a call at 3420 Havana Street. Officer Landry observed a dark-colored vehicle leaving as the officers arrived. The front door frame of the residence was splintered, showing signs that the door had been forced open. A bolt inserted into the threshold of the door had been dislodged by force, and had scraped the floor when the door was opened. The victim and her sister-in-law, Trina Howard, were in a bedroom inside of the residence. The victim was lying on the floor, bleeding profusely from the chest and abdomen, and exclaiming that she was dying. The victim said, several times, in response to questions from Officer Landry, that her husband had stabbed her. Her voice steadily declined, as if she was beginning to lose consciousness. Officer Landry found blood in the kitchen and bathroom.

Dr. Michael DiFatta, qualified as an expert in forensic pathology, performed an autopsy on the victim on the morning of July 29, 1998. The victim had nine stab or slash wounds. Two were defensive in nature. Three were lethal. In one wound the blade of

the knife went into, but did not penetrate, one of the victim's ribs. Dr. DiFatta stated that such an impact with the rib could have caused the blade of the knife to chip, break off or bend.

Lieutenant Stephen J. Gordon, commander of the New Orleans Police Department's communications division, which handles 911 calls, identified a complaint history of a July 29, 1998 homicide at 3420 Havana Street. He also identified an audio cassette recording of two 911 calls made in connection with the case. The first call came in at 1:27 a.m., the second at 1:36 a.m. That cassette was introduced in evidence and played for the jury.

Officer Edward Delery, with the New Orleans Police Department's crime lab, testified that the previous day he was a potential juror for defendant's trial. He did not discover that he had processed evidence in the case until he received an instanter subpoena with the case number the following morning, and pulled out the evidence to review. Officer Delery was qualified by stipulation in the locating and lifting of fingerprints, as well as in the practices and procedures of the crime lab. He examined two empty beer bottles, two torn and empty condom packages and a knife, but was unable to find any fingerprints suitable for identification. The bloodstained knife had an eight-inch serrated-edge that was bent.

Detective Lawrence Green assisted Detective Andre Gilds in taking a statement from defendant. He identified a rights of arrestee form signed by himself and the petitioner and witnessed by Detective Gilds. Detective Green replied in the affirmative when asked whether petitioner had indicated in his statement that he had been involved in an altercation with the victim that led to her injuries. Detective Green testified later that he applied for a search warrant for petitioner's apartment.

Detective Andre Gilds testified that he met the petitioner at the third district police station, where petitioner voluntarily gave a statement. Petitioner said he went to his wife's home to deliver a vehicle to her. He observed a blue Maxima in the driveway. He knocked on the door several times, but no one answered. He said he then kicked the door in, and observed his wife in the bedroom with another subject. That subject ran around petitioner and exited the residence, at which time the victim came after petitioner with a knife. Petitioner said he was blocking blows with the knife, and that was how the victim got stabbed. Detective Gilds said the petitioner did not have any wounds at all. The petitioner lived at 12345 I-10 Service Road, in apartment 2510 of the Chenault Creek Apartments. Search warrants were secured for that apartment and petitioner's car. Detective Gilds recovered a rental agreement in petitioner's name inside of the apartment. The

detective searched petitioner's black Nissan on August 3, 1998, and recovered a registration certificate and an insurance card, both bearing petitioner's name.

Detective Gilds stated on cross examination that the knife was on a table in the kitchen-dining area when he arrived at the scene of the homicide. The detective confirmed that his investigation concluded that the knife had been at the residence the entire time, and further confirmed that he had no evidence that petitioner took a knife to the residence. He confirmed that petitioner claimed that he went to the victim's Havana Street residence intending to deliver the black Nissan to her. Detective Gilds confirmed that a Mr. Weber reported that he had picked up the knife. Mr. Weber also related that he and the victim had been intimate on the night she was killed. Detective Gilds recalled that petitioner had blood on one of his arms, and that the blood was not from a cut. Condoms were found in the bedroom.

George Weber testified that he and the victim had both been employed at Tulane University Medical Center. On the night she was killed, he worked the 3-11 p.m. shift. The victim telephoned him at work and asked him to take her to get something to eat after work. He picked the victim up at her residence after he left work and drove her to pick up some fast food. He stopped and purchased

a couple of beers, and they arrived back at her residence shortly after midnight.  They had sex, and Mr. Weber fell asleep.  He identified a photograph depicting a nightstand next to the victim's bed, a beer bottle, a hospital identification card, and a condom wrapper.

Mr. Weber said he awoke to see the victim pacing back and forth frantically, getting dressed while talking very fast on the telephone.  He thought she had called 911.  After she hung up the telephone, she told Mr. Weber that "he's coming," and that "he" had said that "he" knew she was over there with "that red Army dude." A minute or two later, someone started kicking the door so hard that the structure shook.  Mr. Weber said he finished dressing just as the door was flung open.  He grabbed a knife that was next to the bedroom nightstand, because he did not know if the intruder, who he later identified as the petitioner, was armed or with others.  Mr. Weber identified the murder weapon as that knife.  He told petitioner that he did not know what was going on between the two of them, and to let him leave.  Petitioner told him to leave, that they were just going to talk, and stepped aside to let him leave.  As Mr. Weber walked out of the residence, he heard petitioner twice say to the victim that he was going to shoot "him."  Mr. Weber still had the knife in his hand, but threw it in the flowerbed once he got outside.  He got into his car.  As he

drove away, he noticed petitioner run out of the residence, jump off the porch to the area where he had thrown the knife, bend down, and then run back into the residence. Mr. Weber said he then drove around the corner and called 911.

Mr. Weber admitted on cross examination that he told police that he and the victim had a sexual relationship, although this was not reflected on his typed statement. Mr. Weber said petitioner did not threaten him with a weapon, and indicated that he did not see petitioner with a weapon. Mr. Weber confirmed that he told police that petitioner was in a rage, although he said that was just a general statement. He stated at trial that petitioner appeared to be very upset. When asked whether it was a "panic-type of situation," Mr. Weber replied, "You might say that." He did not know whether or not there had been more than one knife in the house. On redirect examination, Mr. Weber replied in the negative when asked whether he had seen any other knife in the bedroom or had seen the victim with a knife.

## III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and

fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §2254(d)(1).  The United States Supreme Court has noted:

> §2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state

court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

IV. ANALYSIS

A. Trial Court Erred in Allowing Jury to Hear 911 Tapes

Petitioner argues that the trial court violated his Sixth Amendment right of confrontation by allowing the jury to hear the 911 tapes because they were inadmissible hearsay under the dictates of Crawford v. Washington, 541 U.S.36 (2004).[6] The State argues that petitioner failed to exhaust his state court remedies with regard to the instant claim and, as his time for doing so has expired under LSA-C.Cr.P. Art. 930.8, his claim is procedurally barred.

It is well-established that a petitioner must exhaust his available state court remedies before proceeding to federal court for habeas relief. 28 U.S.C. §2254 (b)(1)-(3); Rose v. Lundy, 455 U.S. 509 (1982). Generally, the exhaustion requirement is satisfied only when the grounds urged in a federal petition were

_____

[6]In Crawford, supra, the United States Supreme Court discussed the Confrontation Clause and held that testimonial hearsay statements may generally be admitted as evidence at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant.

previously presented to the state's highest court in a procedurally proper manner. <u>Dupuy v. Butler</u>, 837 F. 2d 699, 702 (5th Cir. 1988).

A review of the state court record reflects that in his application for post conviction relief filed with the state district court, petitioner raised two issues: 1) the court erred in allowing the jury to hear the 911 tapes because they were inadmissible hearsay under <u>Crawford v. Washington</u>; and, 2)defense counsel was ineffective during voir dire relative to Edward Delery and counting his peremptory challenges.[7]  Following the trial court's September 7, 2007 evidentiary hearing, petitioner filed a supplement to his post-conviction application in which he explained that the purpose of the supplement was to expand the scope of his ineffectiveness claim to encompass not only trial counsel's alleged ineffectiveness during voir dire, but also "counsel's overall ineffectiveness and unpreparedness."[8]  Contrary to the State's suggestion (<u>see</u> rec. doc. 12, p. 9), nowhere in his supplemental memorandum does petitioner state that he is abandoning his claim of a <u>Crawford</u> violation due to the introduction of the 911 tapes.  The

---

[7]<u>See</u> State court record, vol. 7 of 7, "Application for Post-Conviction Relief" at p. 16.

[8]<u>See</u> State rec., vol. 7 of 7, "Johnny Jones's Supplement to his Application for Post-Conviction Relief" at p. 1.

fact that the trial court, in granting petitioner post-conviction relief, did not address the <u>Crawford</u> claim, is irrelevant for purposes of determining whether or not petitioner exhausted his state court remedies. <u>See</u> <u>Houston v. Estelle</u>, 569 F.2d 372, 375 (5th Cir. 1978) (quotation omitted) ("[W]hether the exhaustion requirement of 28 U.S.C. §2254(b) has been satisfied cannot turn upon whether a state ... court chooses to ignore in its opinion a federal constitutional claim squarely raised in the petitioner's brief in the same court....")

A review, however, of the post-conviction pleading petitioner filed with the Louisiana Fourth Circuit Court of Appeal reveals that petitioner did, later, abandon his <u>Crawford</u> claim. Petitioner did not raise his <u>Crawford</u> claim in his response to the State's post-conviction writ application to the state appellate court.[9] Further, in its post-conviction opinion, the Louisiana Fourth Circuit recognized petitioner's change in focus. The court acknowledged that petitioner commenced his post-conviction proceedings with two claims, "[t]he first involved the admission of 911 tapes", and the second, "an allegation that trial counsel was

_____

[9]<u>See</u> State rec., vol. 7 of 7, "Response to State's Application for Writ of Certiorari and Prohibition to Review the Ruling of the Honorable Frank A. Marulo [sic], Section "D" Criminal District Court for the Parish of Orleans Case No. 401-103".

ineffective in his voir dire examination." State v. Jones, No.
2008-K-0011, p. 2 (La. App. 4 Cir. Apr. 21, 2008) (unpublished
opinion). However, the court explained that the proceedings, as a
result of the testimony elicited during the post-conviction
evidentiary hearing, evolved into an expansion of petitioner's
ineffectiveness claim and an abandonment of his Crawford claim.
Id. at pp. 2-3.

Petitioner, in his post-conviction writ application to the
Louisiana Supreme Court, did not contradict the Louisiana Fourth
Circuit's assessment regarding the limited scope of his post-
conviction writ application. Instead, petitioner set forth as his
sole claim for relief: "Whether the Fourth Circuit erred in finding
that the trial court abused its discretion when it found that Mr.
Jones's trial counsel was unprepared and ineffective in light of
the testimony at the evidentiary hearing."[10]

Clearly, because petitioner did not raise before the Louisiana
Fourth Circuit Court of Appeal and the Louisiana Supreme Court his
claim that the trial court, in violation of Crawford, supra, erred
in admitting the 911 tapes, he has failed to exhaust his state

---

[10]See State court rec., vol. 7 of 7, "Application for
Supervisory Writs on Behalf of Petitioner Johnny Jones", p. 8.

15

court remedies as required under <u>Rose</u>, <u>supra</u>.[11]

As noted earlier, the State argues that because petitioner's time for going back and raising his <u>Crawford</u> claim before the state appellate and supreme courts has expired under LSA-C.Cr.P. Art. 930.8, petitioner's claim is procedurally barred. For the following reasons, the Court agrees.

There are two factual scenarios under which a petitioner is deemed to have forfeited his federal habeas claim, one is where "a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, ('traditional' procedural default)", and the other is where "the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred, ('technical' procedural default)." <u>Papillion v. Cain</u>, 2007 WL 3046063, *9 (W.D. La. Jul. 31, 2007), <u>citing</u>

_____

[11]The court notes that petitioner, in connection with his direct appeal, did raise before the Louisiana Supreme Court a challenge to the admissibility of the 911 tapes. Specifically, counsel, on petitioner's behalf, citing state law to support his claim, argued that the 911 tapes were cumulative and that their prejudicial effect outweighed their probative value. (A copy of the brief, "Application for Supervisory Writs From The Fourth Circuit's Denial of Mr. Jones's Original Appeal", is contained in the State rec., vol. 6 of 7). However, at no point did counsel base his challenge to the admissibility of the 911 tapes on <u>Crawford</u>, though the <u>Crawford</u> decision had been rendered at the time the pertinent brief was filed.

<u>Bledsue v. Johnson</u>, 188 F.3d 250, 254-255 (5th Cir. 1999), <u>citing</u>

<u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n.1 (1986), and <u>O'Sullivan</u>

<u>v. Boerckel</u>, 526 U.S. 838 (1999).   With respect to the above-

described "'technical' procedural default", the court explained:

> A petitioner has "technically exhausted" his federal
> claim if he fails to properly and timely present his
> claim to the Louisiana courts and is time-barred from
> seeking relief in the Louisiana courts because he has
> allowed his state court remedies to lapse.  <u>Magouirk v.</u>
> <u>Phillips</u>, 144 F.3d 348 (5th Cir.1998), <u>citing</u> <u>Coleman v.</u>
> <u>Thompson</u>, 501 U.S. 722, 731-33, 111 S.Ct. 2546 (1986),
> and <u>Sones v. Hargett</u>, 61 F.3d 410, 416 (5th Cir.1995);
> <u>Coleman</u>, 111 S.Ct. 732, 735 n. 1; <u>Bledsue</u>, 188 F.3d at
> 254-55; <u>Fuller v. Johnson</u>, 158 F.3d 903, 905-06 (5th
> Cir.1998).  In such a case, ... there is no difference
> between non-exhaustion and procedural default.  <u>Magouirk</u>,
> 144 F.3d at 358.  Accordingly, when a petitioner fails to
> exhaust state court remedies because he has allowed his
> federal claims to lapse, those claims are "technically"
> procedurally defaulted.  <u>Id</u>.

<u>Papillion</u>, 2007 WL at *9.

Clearly, petitioner has "technically" procedurally defaulted

with regard to his <u>Crawford</u> claim.  To escape a dismissal of said

claim based on his procedural default, petitioner must show "cause"

for his default and "prejudice attributed thereto," or demonstrate

that the federal court's failure to review the defaulted claim will

result in a "fundamental miscarriage of justice."  <u>Glover v. Cain</u>,

128 F.3d 900, 902 (5th Cir. 1997), <u>cert</u>. <u>denied</u>, 523 U.S. 1125

(1998), <u>citing</u> <u>Coleman</u>, 501 U.S. at 731-32; <u>Amos v. Scott</u>, 61 F.3d

333, 338-39 (5th Cir.), <u>cert</u>. <u>denied</u>, 516 U.S. 1005 (1995), <u>citing</u>

<u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989); <u>Engle v. Isaac</u>, 456 U.S.

107, 129 (1982).  Petitioner has failed to make such a showing;

therefore, his claim that the trial court erred in allowing the

jury to hear the 911 tapes because they were inadmissible under the

dictates of <u>Crawford</u>, <u>supra</u>, is technically procedurally barred.

B.    <u>Ineffective Assistance of Counsel</u>

Petitioner first raised his claim of ineffective assistance of

counsel in connection with his state post-conviction proceedings.

In addressing said claim, the Louisiana Fourth Circuit Court of

Appeal examined applicable law.

> As stated in <u>State v. Reichard</u>, 2005-1262 (La. App.
> 4 Cir. 6/21/06), 935 So.2d 727:
>
>> The standard for assessing an ineffective
>> assistance of counsel claim is well-settled;
>> the two-prong standard enunciated in the
>> seminal case of <u>Strickland v. Washington</u>, 466
>> U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
>> (1984), must be applied.  In order to prevail,
>> a defendant must establish both that counsel's
>> performance was deficient and that the
>> deficiency prejudiced the defendant.  As to
>> the former, the defendant must show that
>> counsel made errors so serious that counsel
>> was not functioning as the "counsel" the Sixth
>> Amendment guarantees.  As to the latter, the
>> defendant must show that "counsel's errors
>> were so serious as to deprive him of a fair
>> trial, i.e., a trial whose result is
>> reliable."  To carry his burden, the defendant
>> must show that there is a reasonable
>> probability that, but for counsel's deficient

18

performance the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome."

An "effective counsel" has been defined as "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance." Given that "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." It follows then [that] "trial strategy" type errors do not constitute ineffective assistance of counsel.

Reichard, pp. 4-6, 935 So.2d at 730-31 (citations omitted).

State v. Jones, No. 2008-K-0011 at p. 5.

Petitioner asserts that counsel was ineffective due to his failure to successfully negotiate a plea agreement pursuant to which petitioner would plead guilty to a lesser manslaughter charge. However, because counsel was not able to consummate the plea agreement, petitioner was forced to go to trial on a first-degree murder charge. Further, petitioner contends that because counsel had counted on "pleading out" petitioner's case, he was not properly prepared for trial, having just finished a grueling, highly publicized murder trial in St. Tammany Parish involving a rapper known as the "Camouflaged Assassin", and dealing with the

then-recent 9/11 attacks and uncertainty regarding the safety of family members.

With regard to petitioner's ineffectiveness claim arising from the failed plea agreement, the failure to consummate the deal was not based upon any deficiency on the part of counsel, but rather, as noted by the Louisiana Fourth Circuit, because "the victim's family objected" to such a deal. See <u>State v. Jones</u>, No. 2008-K-0011 at p. 6.

As for petitioner's claim that counsel, believing that petitioner would be able to plead guilty to a lesser manslaughter charge, was not properly prepared to try petitioner's case, the state appellate court, in rejecting said claim, first reviewed the pertinent testimony from defense counsel at petitioner's September 7, 2007 post-conviction evidentiary hearing.

> At the evidentiary hearing, Mr. Boshea [defense counsel] was asked why he would have gone forward with two murder cases in the space of only two or three weeks. Mr. Boshea explained that, first, he believed that the defendant's trial would not go forward. He testified that the assistant district attorney called him during the St. Tammany trial and told him that a plea agreement involving a reduced charge of manslaughter with a sentence of thirty years had been approved by the district attorney's office. Mr. Boshea was in favor of the defendant accepting the plea because he was facing the death penalty and also because the crime was a classic manslaughter. He stated that he would "have adamantly recommended the defendant take the plea." However, the deal was not consummated because the victim's family objected. Therefore, the trial went

forward.

     Mr. Boshea testified that he had no co-counsel or support staff to assist him with the defendant's trial. However, he also stated that he did not usually arrange for co-counsel.  More importantly, he testified that he began trial preparations before the possible plea agreement was reached.  These preparations involved meeting with the family and the defendant, reviewing the motion hearing transcripts and the police report, preparing voir dire, and preparing cross-examination.  He stated that these preparations might have occurred prior to the St. Tammany trial, but more likely after it, starting on the day the State's motion for a continuance was denied.

     Mr. Boshea was specifically asked at the evidentiary hearing if he was prepared for trial.  He responded, "As prepared as I could be."  When asked if he felt he had been adequately prepared, he stated:

> A.  No.  I mean, yes and no.  I mean, I worked the case as hard as I could given the time constraints that I was operating on.  As far as my presentation of the case is concerned, I don't have any real, at all, articulable inadequacies in the way I presented the case, no, [sic] I can't say that.
>
> Q.  Were you exhausted on the 24th?
>
> A.  Of course.
>
> Q.  Were you exhausted throughout the trial?
>
> A.  I mean, you try to eat, you try to sleep, you try to do what you can do.  I mean, no, I'm not going to sit back and say I fell asleep at the table, no.

State v. Jones, No. 2008-K-0011 at pp. 6-7.

Based upon the above, the Louisiana Fourth Circuit reasoned:

> Mr. Boshea never indicates in his testimony that he would have prepared differently for the defendant's trial if the State had been granted the continuance it requested or if he had requested and been granted a continuance. Moreover, the defendant fails to demonstrate any specific prejudice or show any specific deficiencies in the way Mr. Boshea either prepared or conducted the case.

State v. Jones, No. 2008-K-0011 at p. 7.

As with his state post-conviction pleadings, petitioner, in his federal habeas supporting memorandum, fails to set forth "any specific prejudice or show any specific deficiencies in the way Mr. Boshea either prepared or conducted the case." As such, petitioner has failed to satisfy his burden of proof, under Strickland, for the purpose of proving ineffectiveness on the part of counsel.

Petitioner's remaining ineffectiveness claims concern counsel's performance during voir dire. To fully understand the basis of petitioner's claims, some background information, obtained from the Louisiana Supreme Court's opinion, State v. Jones, 884 So.2d 582, No. 2003-K-3542 (La. Oct. 19, 2004), is necessary.

During voir dire, New Orleans Police Department Crime Lab Technician Edward Delery was called in the general venire as a prospective juror for petitioner's case. Defense counsel

22

challenged Officer Delery for cause based upon the fact that he was a police officer with the New Orleans Police Department. The trial judge denied the cause challenge for Officer Delery, finding that the fact that he was a police officer did not make him ineligible to be a juror.[12] Thereafter, defense counsel used a peremptory challenge to dismiss Officer Delery from the jury venire.

The following day, after the jury had been chosen and sworn in, the prosecutor became aware that almost three years prior to trial Officer Delery processed several items in the police department crime lab which had been seized from the crime scene in this case. The prosecutor immediately informed defense counsel of this fact and a hearing was held outside the presence of the jury before testimony began.

At this hearing, Officer Delery testified that he was in charge of the Forensic Light Unit of the New Orleans Police Department's crime lab. This section of the crime lab uses chemical processes to determine whether identifiable fingerprints can be found on objects. The report generated in this case showed that Officer Delery had been unable to locate any fingerprints on

---

[12]The court's ruling in this regard was in accordance with state law which provides that "a person is not automatically disqualified to serve as a juror simply because of his status as a police officer." State v. Jones, 884 So.2d at 589, citing State v. Ballard, 98-2198 (La. 10/19/99), 747 So.2d 1077.

the objects submitted from the crime scene.  Officer Delery used the police item number, and not the name of the defendant or arrested subject, when he worked on a case.  Thus, Officer Delery was unaware that he had analyzed any evidence for this particular case when he participated in voir dire questioning the previous day.  Officer Delery testified that he analyzed approximately 2000 different items in an average year in approximately 500 separate cases.  He had no independent recollection of the items analyzed in this case and became aware that he worked on this case only when he received a subpoena from the defense that morning, after the defense was informed by the State that Officer Delery participated in the investigation.  Officer Delery had not discussed the case with any persons in the jury venire, nor had he discussed the case with the prosecutor's office prior to that morning.

Assistant District Attorney Jonathan Friedman also testified at the hearing.  He stated that he was assigned to the case the week before trial.  His review of the district attorney's case file did not contain the report generated by Officer Delery.  Officer Delery's report was contained in the case file of the lead detective.  Because the lead detective was out of town when Friedman was assigned to the case, the prosecutor did not obtain the detective's file until jury selection.  The prosecutor did not actually review the detective's file until the night after the jury

was selected and early that very morning. At 8:15 a.m. that morning, the prosecutor discovered Officer Delery previously analyzed items seized from the crime scene and informed defense counsel of that fact at 8:45 a.m. Thus, Friedman had no knowledge during jury selection that Officer Delery had worked on the case.

After this testimony was adduced outside the jury's presence, the trial judge denied defense counsel's motion for a mistrial finding that, while there may have been some negligence in the handling of the case, there was no ethical violation committed by the prosecutor.

On direct appeal, the Louisiana Fourth Circuit ruled that the trial court erred in denying defense counsel's motion for a mistrial. The court reasoned that because Officer Delery had analyzed and tested evidence in the case, he should have been dismissed for cause and, under Louisiana law, "[w]hen a trial court erroneously denies a defendant's challenge for cause, and thereafter the defendant exhausts his peremptory challenges, prejudice is presumed, and reversible error exists." State v. Jones, 862 So.2d 266, 271 (La. App. 4 Cir., 2003).

In response to the above ruling, the State filed a writ application with the Louisiana Supreme Court. Following its review of the pertinent transcript, the Louisiana Supreme Court discovered

that petitioner, in fact, had not exhausted all of his peremptory challenges, using only eleven of his twelve peremptory challenges. As such, petitioner was not entitled to a presumption of prejudice and, finding that petitioner suffered no actual prejudice as a result of the trial court's denial of his motion for mistrial, reversed the state appellate court's ruling. State v. Jones, 884 So.2d 582, 592 (La. 2004).[13]

Petitioner claims that trial counsel was ineffective due to his failure to discover, prior to trial, Officer Delery's involvement in the case. As a result of this deficiency, counsel's challenge for cause was based solely on the fact that Delery was a police officer, rather than on the fact that he was a police officer who had been involved in investigating the murder for which petitioner was on trial. Petitioner also claims that "defense counsel was negligent in not accurately keeping track of the number of peremptory strikes he had used." (Rec doc. 1, petitioner's memorandum at p. 8).

With regard to petitioner's ineffectiveness claim arising from counsel's failure to learn of Delery's involvement in the case, the

---

[13]Following the Louisiana Supreme Court's reversal and remand, the Louisiana Fourth Circuit affirmed petitioner's conviction and sentence. See State v. Jones. 891 So.2d 760 (La. App. 4 Cir., 2004).

state appellate court noted that petitioner "fails to show that [defense counsel] ... could have obtained prior knowledge about Officer Delery's connection to the case." State v. Jones, No. 2008-K-0011 at p. 8. As the prosecutor testified, it was not until 8:15 a.m. on the morning of trial, after the jury had been chosen, that he became aware of Officer Delery's involvement in the case. See Jones, 884 So.2d at pp. 584-585. Thus, petitioner has failed to show how counsel was deficient in this regard.

As for petitioner's complaint that counsel mismanaged his peremptory challenges by allowing one of the twelve challenges allotted to the defense to go unused, petitioner makes no showing as to what venire member should have been struck with defense counsel's one remaining peremptory challenge. Nor does petitioner make any showing that he requested counsel to use the last challenge to strike a venire member. As such, petitioner clearly has failed to show how he was prejudiced by defense counsel's alleged negligence in not using all twelve of his peremptory challenges. Accordingly;

## RECOMMENDATION

For the foregoing reasons, it is recommended that the application for federal habeas corpus relief of Johnny Jones be dismissed with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. §636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996)(<u>en banc</u>).[14]

New Orleans, Louisiana, this  11th  day of  August  , 2010.


ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[14]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.